```
            UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF WEST VIRGINIA
                    AT CHARLESTON
```

**UNITED STATES OF AMERICA**

v.                            CRIMINAL ACTION NO. 2:09-00131

**SAUL GUIJON-ORTIZ**

<u>MEMORANDUM OPINION AND ORDER</u>

Upon the motion to suppress of the defendant Saul Guijon-Ortiz, filed September 4, 2009, and the evidence adduced at the hearing held on October 1, 2009, together with the argument and briefing of counsel, the court makes the following findings of fact by a preponderance of the evidence, and conclusions of law.

I.

On April 29, 2009, Corporal F.E. Flowers of the Kanawha County Sheriff's Department spotted a tan Dodge pickup truck moving south on U.S. 119 in the area of Childress Road, just in or out of the city limits of Charleston, West Virginia.  Cpl. Flowers' attention was drawn to the vehicle as he observed it swerving within its lane of travel and crossing the white fog line on the right, indicating to the officer both that the driver

may be impaired and that the driver was failing to maintain control. He clocked the vehicle by radar at 66 miles per hour, being one mile over the posted speed limit. Based on these perceived traffic violations, Cpl. Flowers initiated a stop of the vehicle at 2:11 p.m. on Route 119 near Champion Road. Upon approaching the vehicle, Cpl. Flowers found three individuals in it consisting of the driver, the front seat passenger and the rear seat passenger who proved to be the defendant.

Cpl. Flowers asked all three occupants for identification. The driver provided a Georgia driver's license and the front seat passenger provided a Georgia identification card. The defendant provided a card entitled in large, bold caps "PERMANENT RESIDENT CARD." The card purported to be an Immigration and Naturalization Service card and contained what may be the defendant's picture with the name and INS number as follows: Gaitan, Daniel   INS A # 092-106-084.

When the defendant was asked for identification, he did not acknowledge the officer's request. The driver, speaking in Spanish, directed the defendant to provide identification to the officer. The defendant appeared to the officer to be very nervous and was shaking when he then produced the Permanent Resident Card.

The officer, by radio to his headquarters, checked the identification provided by each of the three occupants through the National Crime Identification Center ("NCIC") and, within 30 seconds, received a negative report on all three.  At approximately 2:30 p.m., Cpl. Flowers, using his cell phone, then contacted his headquarters and was connected to the Immigration and Customs Enforcement ("ICE") office in Charleston, West Virginia, where Special Agent Gary Hilton answered.  The officer provided Hilton with the identification information that had been provided him by the three occupants including that which was found on the Permanent Resident Card furnished by the defendant.  After a few minutes of checking by Hilton, Cpl. Flowers was informed by Hilton that the INS number shown on the card did not match the name thereon of Daniel Gaitan.

The mismatch indicated that the defendant may be an illegal alien with a fake Permanent Resident Card.  Consequently, Hilton asked to speak to all three of the occupants and did so.  Hilton was particularly interested in speaking to the defendant so that he could be sure he had the name and number correctly as it appeared on the card, and ascertain whether the defendant was in this country illegally.  In the course of speaking by cell phone to the defendant, who was on the side of the road at the

time, Hilton had the conversation conducted by Special Agent Crystal Beveridge who, unlike Hilton, spoke Spanish to some degree. Beveridge spoke to the defendant for about three to five minutes at the end of which she reported that the defendant had admitted being in this country illegally.

    Hilton then informed Cpl. Flowers that there was probable cause to believe the defendant was an illegal alien and asked Flowers to transport the defendant to the ICE office. Cpl. Flowers, having determined that the driver showed no signs of being intoxicated, then returned the driver's license and identification card to the other two occupants and released them after advising them that the defendant was being detained. He made it a point to see that the driver provided his cell phone number to the defendant and also gave the driver the telephone number of the ICE office so that the driver could return to Charleston to pick the defendant up if ICE did not need him any longer.

    Cpl. Flowers then for his safety handcuffed the defendant and put him in the rear seat of his patrol car. He transported the defendant to the ICE office in Charleston, arriving some 12 to 15 minutes later about 3:00 p.m. Cpl. Flowers handed over the Permanent Resident Card furnished by the

defendant, retrieved his handcuffs from the defendant and, leaving the defendant there, departed.

Through an interpreter, during the next ten minutes Hilton received biographical information from the defendant to verify his name, date of birth, address and the like. The requested biographical information was obtained using a form. (See Govt. Ex. 2). The defendant continued to assert his name as being Daniel Gaitan. Hilton then took the defendant's fingerprints which promptly revealed the defendant's true identity and that he was a deported alien, a process that took another ten minutes.

Down to this point, the defendant was at ICE for administrative processing, it being found that the defendant was an illegal alien subject to deportation and, in addition, had been deported on account of a prior felony conviction. Hilton, noting that such cases are generally pursued administratively rather than criminally, then began the process of administratively reinstating the defendant's prior order of deportation.

ICE Special Agent Patrick Kelley, the duty agent in charge, arrived about 4:30 p.m. and completed the administrative

process.  Before doing so, Agent Kelley attempted to contact ICE liaison with the United States Attorney's office to consult and determine whether prosecution would be accepted.  Being unable to reach his contact there, Agent Kelley proceeded to the completion of the administrative process.  In the course of doing so, Agent Kelley issued a Notice of Intent/Decision to Reinstate the Prior Order of Removal entered on January 3, 2008, pursuant to which the Resident Agent in Charge, Robert F. Chesney ("RAC), certified the defendant as subject to removal accordingly.  Agent Chesney in turn issued, on that same date of April 29, 2009, a warrant for the arrest of the defendant and a warrant for his removal from the United States, which warrants were served about 5:15 p.m. on the defendant.

Agent Kelley then took a sworn statement from the defendant for his administrative removal.  That statement simply set forth the defendant's correct name, date and place of birth and Mexican citizenship, together with the following further statements:

> I last entered into the United States on or about December 1, 2008, without inspection or parole.
>
> I am not a permanent resident of the United States.
>
> I have not applied to the Attorney General of the United States for permission to re-enter the United States after my Removal.

This concluded the administrative process.

Thereafter, <u>Miranda</u> warnings were first given when the defendant signed at 5:35 p.m. a <u>Miranda</u> waiver form.  Although the Mirandized statement has not been furnished, the interview that followed related not only to defendant's reentry but, in case it led to prosecution, the defendant's fraudulent Permanent Resident card and a fraudulent social security card.

The defendant was then turned over to ICE's Office of Detention and Removal on what is described by Agent Kelley as "the administrative reentry charges, reinstated."  He was transported to the South Central Regional Jail but was not charged criminally at that time.

II.

The Fourth Amendment protects the citizenry "against unreasonable searches and seizures." U.S. CONST. amend. IV. Regarding the initial traffic stop by Cpl. Flowers, our court of appeals observed as follows in <u>United States v. Branch</u>, 537 F.3d 328 (4th Cir. 2008): "It is well established that the '[t]emporary detention of individuals during the stop of an automobile by the police . . . constitutes a "seizure,"' no matter how brief the detention or how limited its purpose."  <u>Id.</u>

7

at 335 (quoting Whren v. United States, 517 U.S. 806, 809 (1996)). The decision in Branch additionally notes, however, that an officer who observes a traffic violation is vested with "sufficient justification . . . to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." Id. at 335. The vehicle within which defendant was a passenger was swerving within its lane of travel at a speed exceeding the posted limit. Cpl. Flowers was thus authorized to detain the vehicle for as long as was necessary to accomplish the purpose of the traffic stop.

Regarding Cpl. Flowers' simultaneous request for identification from each of the vehicle's occupants, it is now settled that when a lawful traffic stop is made, "an officer . . . to gain his bearings and . . . acquire a fair understanding of the surrounding scene . . . may request identification of . . . [vehicular] passengers . . . ." United States v. Soriano-Jarquin, 492 F.3d 495, 500 (4th Cir. 2007). The request for identification was lawful.

Next, Cpl. Flowers' inquired with ICE after learning that there were no outstanding warrants for the three men and that the driver's operator's license and registration were valid. Defendant asserts it was incumbent upon Cpl. Flowers to allow

them to proceed on their way at that point.  As our court of appeals has observed, however, it is "well established that during a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation."  United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004).  Cpl. Flowers would thus have been permitted the time necessary to issue the citation for speeding.  Instead, he devoted that time to the ICE check, a constitutionally permissible choice.  Cf. Branch, 537 F.3d at 335 ("A canine sniff is also constitutionally acceptable if performed within 'the time reasonably required' to issue a traffic citation.") (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)).

Assuming the time for the ICE check is deemed a prolongation of the initial stop, one must examine whether there was additional reasonable suspicion justifying the further, brief detention of the vehicle and its occupants.  A prolonged stop exceeding that necessary to address the circumstances warranting the initial stop depends upon whether law enforcement, following the initial stop, developed further reasonable suspicion to support the longer detention.  See, e.g., Branch, 537 F.3d at 336 (noting "a prolonged automobile stop requires either the driver's consent or a 'reasonable suspicion' that illegal activity is

9

afoot."). The determination includes a consideration of the defendant's conduct during the stop and other indications that criminal activity is afoot. See, e.g., United States v. Mayo, 361 F.3d 802, 806, 808 (4th Cir. 2004).

In examining the totality of the circumstances, one must recall that Cpl. Flowers executed the vehicle stop after observing erratic driving. This was not the case of a simple broken tail light or an expired license plate. Second, when defendant was asked for identification, he failed to acknowledge the request. Assuming that failure was the product of a language barrier, Cpl. Flowers was not required to accept at face value the contention that defendant was unable to converse in English. Third, when defendant eventually complied with Cpl. Flowers' instruction to provide the identification, he was very nervous, indeed shaking.

These circumstances provided Cpl. Flowers a reasonable and articulable basis for the brief prolongation, if any, that is deemed to have occurred. Additionally, as noted at length in Soriano-Jarquin, the principal justification of officer safety supports allowing law enforcement to request and examine driver and occupant identification. See Soriano-Jarquin, 492 F.3d at 499. This is an especially worthy consideration here, in view of

the fact that Cpl. Flowers executed the stop alone, confronted by three individuals, at least one of whom appeared very nervous about the law enforcement scrutiny devoted to him.  In sum, balanced against the few minutes by which the ICE check of the Permanent Resident Card may have prolonged the initial stop, the court cannot conclude Cpl. Flowers or ICE agents transgressed any Fourth Amendment boundary lines.[1]

Regarding Cpl. Flowers' request that defendant exit the vehicle following the revelation that the Permanent Resident Card contained an irregularity, there is likewise no constitutional violation.  <u>Maryland v. Wilson</u>, 519 U.S. 408, 415 (1997) ("We . . . hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop."); <u>Soriano-Jarquin</u>, 492 F.3d at 500; <u>United States v. Sakyi</u>, 160 F.3d 164, 168 (4th Cir. 1998).

---

[1]The decision in <u>Soriano-Jarquin</u> is not to the contrary. That decision involved a police trainee processing a driver's identification and preparing citations for various vehicle irregularities while, simultaneously, another officer received the passengers' identifications after noting their initial reluctance to provide the information and their obvious nervousness concerning the request.  This reluctance aroused the officer's suspicion that the occupants were illegal aliens.  The officer then contacted ICE after he understood the driver to confirm, by gesturing, that the occupants were indeed illegal aliens.  The court of appeals concluded that prolongation of the stop was warranted.  While the driver here did not confirm defendant's illegal status, there was a sufficient basis to check with ICE under the circumstances.

Regarding the inculpatory statements via mobile phone to Beveridge, one must determine if the questioning exceeded the permissible boundaries of a Terry stop or, alternatively, that defendant was then in custody such that Miranda warnings were a necessary prerequisite.  Regarding the scope of the Terry stop, "[o]fficers may temporarily detain an individual under Terry for purposes of questioning . . . when reasonable suspicion exists." United States v. Leshuk, 65 F.3d 1105, 1110 (4th Cir. 1995) (citing Berkemer v. McCarty, 468 U.S. 420, 439 (1984) (observing that Terry stops typically involve the officer asking "a moderate number of questions to determine [the detainee's] identity and to try to obtain information confirming or dispelling the officer's suspicions . . . .") and United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975) (holding that reasonable suspicion of criminal activity warrants temporary seizure in order to question detainees about suspicious circumstances)).  The questioning by Beveridge was designed precisely to achieve the ends approved in Leshuk, Berkemer, and Brignoni-Ponce.  Reasonable suspicion properly arose once the discrepancy was noticed concerning the Permanent Resident Card.  The further brief detention and questioning was necessary to allay, or confirm, law enforcement suspicions concerning defendant's status.

Moreover, the warnings prescribed by Miranda apply only to those who are in law enforcement custody.  United States v. Jamison, 509 F.3d 623, 628 (4th Cir. 2007).  One is deemed to be in custody when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting Mathiason, 429 U.S. at 495).  It appears well settled that one who is temporarily detained during a traffic stop is not typically deemed to be in custody for purposes of Miranda.  See Berkemer, 468 U.S. at 440; United States v. Sullivan, 138 F.3d 126, 131 (4th Cir. 1998) ("Miranda warnings are required only when the motorist is detained to an extent analogous to an arrest.").  Inasmuch as there is no indication defendant was in custody when questioned by Beveridge during the roadside encounter, he was not entitled to Miranda warnings.

After defendant admitted to Beveridge that he was in the United States illegally, the question arises concerning the lawfulness of his transport to ICE offices, at that agency's request, by Cpl. Flowers.  At the time of transport, Cpl. Flowers had learned of the variance between the name on the Permanent Resident Card and the number assigned.  He additionally learned from Beveridge that defendant admitted to his illegal status.

Cpl. Flowers thus possessed probable cause to believe defendant was violating the Immigration and Nationality Act.[2]  He was authorized to place the defendant under arrest.  Rather than doing so, Cpl. Flowers elected to abide by the request of ICE Agent Hilton to detain and transport defendant to the ICE office, where Cpl. Flowers left him.  Inasmuch as he made no inquiry of defendant during the transport, and removed the handcuffs and promptly left with them, the court cannot conclude any violation of the Fourth Amendment occurred down to this point.

While at the ICE office, the defendant provided biographical information that was followed quickly by the taking

---

[2] At a minimum, Cpl. Flowers had probable cause to conclude defendant had violated 18 U.S.C. § 1546(a), which provides as follows:

> Whoever knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained [shall be guilty of an offense against the United States].

Id.

of his fingerprints. The fingerprints revealed both his true identity and his having been deported after conviction of a felony. Defendant relies upon United States v. Oscar-Torres, 507 F.3d 224 (4th Cir. 2007), for the proposition that the defendant's statements to ICE, his fingerprints, and his alien file are all subject to suppression inasmuch as they "were . . . obtained by exploiting his illegal detention by Cpl. Flowers." (Def.'s Memo. in Supp. at 14). Based upon the preceding conclusion that Cpl. Flowers did not illegally detain him, Oscar-Torres is of limited utility to defendant.

The question remains whether the questions eliciting the biographical information, the fingerprints, and the statement given by defendant at the ICE office prior to his receipt of Miranda warnings should be suppressed for some other reason. Regarding the biographical information and fingerprints, the former having been elicited with the assistance of the ICE form found in Government Exhibit 2, law enforcement is permitted to obtain from an accused certain "standard identification information" without violating Miranda. United States v. Taylor, 799 F.2d 126, 128 (4th Cir. 1986). In other words,

> the taking of basic personal information such as name, age, and place of birth is a ministerial duty incident to arrest and custody which does not constitute "interrogation or its functional equivalent, 'reasonably likely to elicit an incriminating response.'"

15

**Id.** (quoting **United States v. Morrow**, 731 F.2d 233, 237 (1984), in turn quoting **Rhode Island v. Innis**, 446 U.S. 291 301-02 (1980). This "booking exception" is, however, narrow. **See**, **e.g.**, **Pennsylvania v. Muniz**, 496 U.S. 582, 601-2 & n. 14 (1990) (plurality) (acknowledging a "booking exception" to **Miranda** but noting that "the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions . . . .") (citations omitted).

Regarding the law related to fingerprinting in this context, our court of appeals' observations in **Oscar-Torres** are helpful:

> [W]hen fingerprints are "administratively taken . . . for the purpose of simply ascertaining . . . the identity" or immigration status of the person arrested, they are "sufficiently unrelated to the unlawful arrest that they are not suppressible." Thus, fingerprints do not constitute suppressible fruit of an unlawful arrest or detention unless [an] . . . unlawful arrest "was purposefully exploited in order to develop critical evidence of criminal conduct to be used against [the d]efendant" in a criminal proceeding.
>
> . . . .
>
> If prior to fingerprinting an alien has admitted to his unlawful presence in this country (as Oscar-Torres did here), then the Government may have no need or desire to investigate him for criminal activity, and the Government might simply take his fingerprints as part of the routine procedure to process him administratively for deportation. . . . Fingerprinting conducted as part of an arrest intended to lead only to an administrative deportation simply does not present

>the same concerns as the fingerprinting at issue in . . . . . [two Supreme Court cases], which was meant to (and did in fact) lead to criminal prosecutions.

Oscar-Torres, 507 F.3d at 231; see also United States v. Olivares-Rangel, 458 F.3d 1104, 1112-13 (10th Cir. 2006)("Certain routine administrative procedures, such as fingerprinting . . . are incidental events accompanying an arrest that are necessary for orderly law enforcement and protection of individual rights.")(citing 6 Wayne R. LaFave, Search and Seizure § 11.4(g) (4th ed. 2004) ("[F]ingerprinting, like photographing, is a rather standard booking procedure.").[3]

Based upon the entirety of the findings of fact set forth heretofore, the court is satisfied that the 10 minutes of

---

[3]The decision in Oscar-Torres observes additionally as follows:

>Thus, an alien's fingerprints taken as part of routine booking procedures but intended to provide evidence for a criminal prosecution are still motivated by an investigative, rather than an administrative, purpose. Such fingerprints are, accordingly, subject to exclusion.

>[I]mmigration agents testified that they arrested Oscar-Torres simply to deport him, that they fingerprinted him as part of the "normal processing for an alien," and that authorities only contemplated a criminal prosecution when the fingerprints led to the record of Oscar-Torres's prior felony and deportation.

Oscar-Torres, 507 F.3d at 232.

questioning of defendant along the lines set out in Government Exhibit 2, and the taking of his fingerprints, fit within the booking exception.  The evidence was obtained for, and was motivated solely by, the administrative purpose of removal, including the reinstatement of the defendant's prior order of deportation.  It is important to note as well that at the time of the road side encounter ICE was on notice, via defendant's admission, that he did not possess papers showing he was in the United States legally.  Hilton's observations on the point are also noteworthy.  He is unchallenged in asserting that illegal reentry cases are generally pursued administratively rather than criminally.[4]

Based upon the foregoing findings of fact and

---

[4] In view of the findings and conclusions related to the fingerprints, the court need not reach the legality of the sworn statement taken just prior to the conclusion of the administrative process.  That statement reflected the date defendant last entered the United States, without inspection or parole, and that he had not applied to the Attorney General for permission to re-enter following his earlier removal.  Assuming the sworn statement was taken in violation of the Fifth Amendment, the information found therein was already known, or readily available, to ICE once it located defendant's alien file.  Assuming that the exclusionary rule would be in play, the inevitable discovery corollary would eviscerate any basis for suppression.  See United States v. Melgar, 139 F.3d 1005, 1016 n. 3 (4th Cir. 1998) (holding that admission of defendant's statements obtained in violation of his Sixth Amendment rights was harmless error "because, independent of the interrogation, the government would have 'inevitably discovered' [defendant's] alien status"), abrogated on other grounds by Texas v. Cobb, 532 U.S. 162 (2001).  Additionally, the fruits of the interview that occurred subsequent to defendant being provided his Miranda warnings are not suppressible in view of the lack of any antecedent constitutional violation.

conclusions of law, it is ORDERED that defendant's motion to suppress be, and it hereby is, denied.

The Clerk is directed to forward copies of this written opinion and order to the defendant, all counsel of record and the United States Marshal.

DATED: November 25, 2009

John T. Copenhaver, Jr.
United States District Judge